UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

THERESA BILINGSLEA,

                              Plaintiff,

        v.                                        **DECISION AND ORDER**
                                                  06-CV-0556
FORD MOTOR COMPANY, INC.,

                              Defendant.

## I.  INTRODUCTION

        Plaintiff Theresa Billingslea (hereinafter, "Billingslea") commenced this employment

discrimination action by filing a Complaint in the United States District Court for the

Western District of New York.  (Docket No. 1.)  Therein, she alleges that Defendant Ford

Motor Company, Inc. (hereinafter, "Ford") discriminated against her based on her gender

and race and retaliated against her.  Billingslea brings this action pursuant to Title VII of

the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. (hereinafter, "Title VII") and the

New York State Human Rights Law, N.Y. Exec. L. §§ 290 et seq. (hereinafter, "NYHRL").

Presently before this Court is Ford's Motion for Summary Judgment seeking dismissal of

the Complaint in its entirety.[1]  (Docket No. 24.)  Billingslea opposes the motion.[2]  For the

reasons stated below, Ford's motion is granted.

------

        [1]In support of its Motion for Summary Judgment, Defendant filed a memorandum of law, with
exhibits; a Rule 56 Statement of Material Facts, with appendixes and exhibits; and a reply memorandum
of law, with exhibits.

        [2]In opposition to Defendant's motion, Plaintiff filed a memorandum of law and Rule 56 Statement
of Disputed Facts, with exhibits.

## II. BACKGROUND

### A.     Facts

Billingslea, an African American female, was hired at Ford's Buffalo Stamping Plant (hereinafter, the "Plant") in September 1986.  (Def.'s Stmt.,[3] ¶ 1.)  She started as an Automatic Tender Metal Press Line (hereinafter, "ATMPL") worker.  (Id. ¶ 2.)  In or about June 2003, Billingslea successfully bid for a Parts Material Handler Extra Heavy (hereinafter, "PMHEH") position.  (Billignslea Aff. ¶ 4; Duke Aff., Ex. B.)

Since commencing employment at Ford, Billingslea has been a member of the United Auto Workers Union (hereinafter, the "Union").  (Def.'s Stmt., ¶ 1.)  The Union and Ford entered into a Collective Bargaining Agreement (hereinafter, the "CBA"), whereby Ford has the discretion to assign daily work responsibilities to Union members as long as it is within their work classification.  (Id. ¶ 4.)  Employees who believe their assignments are outside their classification or who receive conflicting assignments can file a grievance with the Union.  (Id. ¶ 7.)  In accordance with the CBA, Billingslea received her daily PMHEH assignments from supervisors Dan Saldana (hereinafter, "Saldana") and Joe Rey (hereinafter, "Rey").  (Id. ¶ 5.)

The PMHEH position includes operation of a material handling vehicle, referred to as a tow-grip.  (Id. ¶ 3.)  A tow-grip connects to a basket of parts, and the operator moves the basket to and from the appropriate point on the assembly line.  (Billingslea's Dep. 210:12-13, 21-22.)  Federal and Ford standards require employees to undergo training and

---

[3]Referring to Defendant's Rule 56 Statement of Undisputed Facts, which contains citations to the record evidence in this case.  This Court has confirmed and is satisfied that the evidence cited supports the assertions therein.  Cf. Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 74 (2d Cir., 2001) (holding that factual allegations contained in a Rule 56.1 Statement that find no support in the record evidence must be disregarded and the record reviewed independently).

obtain a license, or safety permit, to operate a tow-grip. (Def.'s Stmt., ¶¶ 3, 8-9.) Billingslea completed the requisite training and was issued a safety permit prior to assuming her PMHEH position. (Id. ¶ 10.)

Pertinent to this litigation is Ford's "Two-Foot Vehicle/Pedestrian Rule" (hereinafter, "Two-Foot Rule"), which states that a tow-grip operator may not power on or move his/her vehicle until pedestrians are at least two feet away. (Id., ¶¶ 11-12.) Pedestrians also are responsible for maintaining a distance of two feet from industrial vehicles. (Id. ¶ 13.) Ford has a policy which mandates a minimum 90-day suspension of an operator's safety permit for a serious violation of safe practices. (Duke Aff. Ex. E.) Accidents involving personal injury may result in permanent suspension. (Id.) The only mitigating factor is where the injured employee (who is not the operator) takes full responsibility for the accident. (Def.'s Stmt., ¶ 17.) Since October 2001, the Safety Department has suspended or permanently revoked over 90 safety permits. (Id. ¶ 22.)

### 1.    May 11, 2005 Accident

On May 11, 2005, Billingslea was operating her tow-grip on lines 22 and 23, as assigned by Saldana. (Pl. Aff ¶ 6; Pl.'s Stmt., ¶ 2.[4]) Billingslea was waiting for two co-workers to finish loading parts into the basket attached to her vehicle when Saldana ordered her to disengage her tow-grip and move to a basket on line 24 that was already full. (Id. ¶ 25.) According to Billingslea, Saldana came from line 24 screaming at her to move to the basket on line 24 "right now." (Pl.'s Stmt., ¶ 2.) Billingslea replied that it was not her responsibility. (Id.) Billingslea attests that Saldana then got between the basket

---

[4]Referring to Plaintiff's Rule 56 Statement of Disputed Facts, which contains citations to the record evidence in this case.

and tow-grip, trying to unhook the basket. (Id.) She stepped off her tow-grip and refused to move to line 24 until she first moved her basket on line 23. (Id.) Billingslea recounts that she and Saldana went back and forth—he would move away from the basket and she would get back on the tow-grip, then he would move back toward the basket and she would step off the tow-grip—at least five or six times. (Id.) Billingslea maintains she never engaged the tow-grip; however, Saldana states she did move the tow-grip forward, striking his leg with the basket. (Id. ¶ 2; Def.'s Stmt., ¶ 34.)

Billingslea states Saldana limped away to call the union, and then returned without a limp to line 24 where she had since moved. (Pl.'s Stmt., ¶ 2.) Saldana again approached the basket, preventing her from operating the tow-grip. (Id.) A co-worker finally told Saldana to stop, at which time Billingslea went back to line 23 and Saldana followed. (Id.) According to Billingslea, Saldana continued to interrupt her work until foreman Allison Jackson arrived. (Billingslea Aff. ¶ 22.) Foreman Jackson then took Billingslea to the Union hall, where she spoke to a union safety representative, who returned with her to her work area. (Id. ¶ 22-23.) Billingslea avers she became so upset by the incident that she started shaking, sweating, and became dizzy. (Id.) She went to see Ford's nurse and then left the Plant by ambulance. (Id.) Saldana received medical treatment for a contusion on his lower left leg, measuring 5 centimeters in circumference. (Def.'s Stmt., ¶ 29.)

Superintendent William LaRosa (hereinafter, "LaRosa") notified the Safety Department about the accident, and Billingslea was prohibited from operating the tow-grip pending an investigation. (Id. ¶ 30.) Billingslea contends LaRosa prevented her from obtaining any overtime work for a period of eleven calendar days after the accident.

(Billingslea Aff. ¶¶ 30.)

Robert Duke (hereinafter, "Duke"), Regional Safety and Security Manager, conducted the investigation, which included viewing the accident scene, interviewing Saldana, Billingslea, and witnesses, and reviewing medical records. (Def.'s Stmt., ¶¶ 32-33, 39.) He subsequently concluded Billingslea struck Saldana while operating the tow-grip. (Id. ¶ 39.) Duke further concluded Saldana contributed to the accident by failing to observe the Two-Foot Rule. (Id. ¶ 40.) Saldana did not accept any responsibility for the incident. (Id. ¶ 35.)

On Mar 23, 2005, the Safety Department notified Billingslea that her safety permit would be suspended for 90 days. (Id. ¶ 43.) The suspension was retroactive to the date of the accident, May 11, 2005. (Id. ¶ 44.) Since Billingslea was unable to keep the PMHEH position without a safety permit, she was temporarily reclassified as an ATMPL worker. (Id. ¶ 45.) The ATMPL position paid $25.83 an hour, twenty-five cents more than she received in the PMHEH position. (Id.) Because Saldana was found to have contributed to the accident, he received a written reprimand from Ford's Personnel Relations, which was placed in his personnel file for one year. (Id. ¶ 48.) Billingslea concedes she was not disciplined, but contends the suspension of her license and loss of overtime were a demotion. (Billingslea Aff. ¶ 45.)

Billingslea was off work on medical leave from May 26, 2005 until September 6, 2005. (Id. ¶ 47.) When Billingslea returned to work in September 2005, she received a standard pay increase to $26.34 an hour. (Id. ¶ 46.) Her safety permit was reinstated on

February 6, 2006, when her 90-day suspension expired.  (Id. ¶ 47.)[5]

## 2.    Ford's Zero Tolerance Policy

Ford has a Zero Tolerance Policy regarding discrimination.  (Def.'s Stmt., ¶ 64.)  The policy has been in place for many years and is well-known to management and employees. (Id.)  Supervisors are taught how to recognize, prevent, and respond to instances of discrimination or harassment.  (Id. ¶ 68.)  And, employees go through diversity training during new employee orientation.  (Id. ¶ 69.)  The Zero Tolerance Policy is posted throughout the Plant, including employee entrances and the cafeteria.  (Id. ¶ ¶ 65, 67.) Ford also has established a "Diversity Council" to aggressively investigate and respond to diversity issues within the Plant.  (Id.)  Furthermore, the Plant Manager has an Open Door Policy, which encourages employees to report any concerns.  (Id. at ¶ 66.)

Billingslea was familiar with Ford's anti-discrimination policy, and, in fact, received training on the prevention of workplace discrimination and proper reporting procedures on more than five occasions.  (Id. ¶ 70.)  Billingslea was aware of the options available to her if she felt discriminated against, including calling Ford's hotline, reporting incidents to supervisors, or filing a complaint with Labor Relations.  (Id. ¶ 72.)

## 3.    Disparate Treatment

Billingslea alleges Saldana engaged in disparate treatment because of her race (African American) and gender (female).  Specifically, she alleges the following:

> a.    Supervisor Saldana assigned Billingslea extra work, while similarly situated Caucasian male employees were allowed to sit and do nothing; and

---

[5] Suspensions are measured in actual days worked and exclude personal leave.  (Def.'s Stmt. ¶ 47.)

      b.      Supervisor Saldana faked an injury so that Billingslea's machine operator's license would be suspended and she would be forced to take another position at lower pay where she was excluded from receiving overtime.

(Compl., ¶¶ 19, 28-30.)

Billingslea concedes that Saldana never used any derogatory language towards her, such as racial slurs or comments about her gender. (Billingslea Dep. 222:9-23, June 6, 2007). However, she contends her claims for race and gender discrimination are supported by the fact that she was the "only black female material handler in the area." (Id. 203:4-6.)

## 4. Retaliation

These same incidents—Saldana's assignment of extra work and his faking an injury—are also the basis for Billingslea's retaliation claims. (Id. 207-08.) Billingslea asserts that prior to the May 11, 2005 accident, she complained to Supervisor Rey daily about Saldana assigning her "extra work" that should have been performed by Paul Murphy (hereinafter, "Murphy"), a Caucasian male. (Billingslea Aff. ¶ ¶ 11-13, 24.) Billingslea does not specify which of Murphy's duties she was assigned to, but she admits that Saldana did not assign her work outside of her classification. (Def.'s Stmt., ¶ 52.)

Billingslea states that when she got tired of complaining to Rey, she called the Union. (Billingslea Dep. 197:12-13, June 6, 2007.) However, Ford never received any grievances from the Union on Billingslea's behalf regarding Saldana. (Def.'s Stmt., ¶ 57.) Billingslea states she also complained to Supervisor Anthony Casucci about Saldana on at least two occasions prior to May 11, 2005. (Billingslea Aff. ¶ 27.) The particular situations she complained of were resolved, but she contends Saldana continued to treat

her differently than his "group of guys."  (Id.)  She believes that Saldana faked his injury on May 11, 2005 in retaliation for her complaints to Rey and Casucci so that her safety permit would be suspended.  (Id. ¶ 46.)

On May 27, 2005, four days after her safety permit was suspended, Billingslea drafted a written complaint to Labor Relation and left it on the desk of Human Resources Associate Natasha Hill, noting issues with Saldana regarding harassment, defamation of character, discrimination, creating an unsafe work area, and creating a hostile work area. (Def.'s Stmt., ¶ 58; Def.'s Ex. E.[6])  Billingslea concedes that prior to May 27, 2005, she did not mention race or gender discrimination in any complaints about Saldana.  (Billingslea Dep. 178:5-9;196-97, June 6, 2007.)

## B.    Procedural History

Billingslea filed a charge of discrimination with the EEOC on August 20, 2005, alleging discrimination because of her race and gender from May 23, 2005 until August 9, 2005.  (Compl., Ex. A.)  The EEOC investigated Billingslea's charges and was unable to conclude that the allegations amounted to violations of Title VII.  (Id., Ex. B.)  A Notice of Dismissal and Right to Sue was mailed May 23, 2006.  (Id., Ex. C.)  Billingslea filed her Complaint with the Clerk of this Court on August 18, 2006.  (Docket No. 1.)  Ford filed the instant Motion for Summary Judgment on December 28, 2007.  (Docket No. 24.)

---

[6]Referring to exhibits attached to Defendant's Attorney Affidavit.

# III. DISCUSSION AND ANALYSIS

## A.    Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment is warranted where "the pleadings, the discovery and disclosure material on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2).  A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  A fact is "material" if it "might affect the outcome of the suit under governing law." Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S.Ct.1598, 1609, 26 L.Ed.2d 142 (1970).  Summary judgment is proper "only when reasonable minds could not differ as to the import of evidence." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

In the context of employment discrimination cases, the United States Court of Appeals for the Second Circuit has explicitly cautioned district courts to use extra care when deciding whether to grant summary judgment because "the ultimate issue to be resolved in such cases is the employer's intent, an issue not particularly suited to summary adjudication." Eastmer v. Williamsville Cent. Sch. Dist., 977 F. Supp. 207, 212 (W.D.N.Y.

1997) (quoting <u>Gallo v. Prudential Residential Servs.</u>, 22 F.3d 1219, 1224 (2d Cir. 1994)).

Nonetheless, "[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." <u>Meiri v. Dacon</u>, 759 F.2d 989, 998 (2d Cir. 1985). Indeed, the Second Circuit has noted that "the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to commercial or other areas of litigation." <u>Id.</u>

**B.    Plaintiff's Discrimination Claims under Title VII**

    **1.    Title VII Framework**

Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1); <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90, 123 S.Ct. 2148, 2150, 156 L.Ed.2d 84 (2003). It is now well settled that discrimination claims brought under Title VII are analyzed under the burden-shifting analysis first set forth by the United States Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 36 L. Ed.2d 668 (1973). <u>See Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 142-43, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000).

The burden-shifting test first requires that the plaintiff establish a *prima facie* case of discrimination. If the plaintiff meets this initial burden and establishes a *prima facie* case, a rebuttable presumption of discrimination arises, and the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action.

Texas Dep't of Comt'y Affairs v. Burdine, 450 U.S. 248, 254, 101 S. Ct. 1089, 1094, 67 L. Ed.2d 207 (1981)).  If the defendant succeeds in making this showing, "the presumption of discrimination arising with the establishment of the *prima facie* case drops from the picture."  Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11, 113 S. Ct. 2742, 125 L. Ed.2d 407 (1993)).

Assuming that the defendant meets its burden at the second stage, the burden returns to the plaintiff to prove that the defendant's discrimination was intentional.  In this regard, the plaintiff must produce "evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." Weinstock, 224 F.3d at 42.  "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination."  Id.  However, "[i]t is not enough . . . to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination." Id. (quoting St. Mary's, 509 U.S. at 519).

### 2.    Plaintiff's Disparate Treatment Claims

A Title VII disparate treatment claim arises when a member of a protected class is treated less favorably than others under circumstances from which an unlawful motive could be inferred.  See Schwabenbauer v. Bd. of Ed. of City Sch. Dist. of City of Olean, 667 F.2d 305, 309 (2d Cir. 1981); see also Ott v. Perk Dev. Corp., 846 F.Supp. 266, 275 (W.D.N.Y. 1994).

### a.    Plaintiff's *Prima Facie* Case

"The burden of establishing a *prima facie* case of disparate treatment is not onerous."  Burdine, 450 U.S. at 253; see also Carlton v. Mystic Transp., Inc., 202 F.3d 129,

134 (2d Cir. 2000) (characterizing burden as "minimal").  To state a *prima facie* case, a plaintiff must show that (1) she is a member of a protected class, (2) she is qualified for her position, (3) she suffered an adverse employment action, and (4) the circumstances of the adverse action give rise to an inference of discrimination.  Weinstock, 224 F.3d at 42 (citing McDonnell Douglas, 411 U.S. at 802).  The first two elements are not in dispute.  However, Ford argues that Billingslea has not satisfied the third and fourth elements.

### (1) Adverse Employment Action

An "adverse employment action is one that affects the terms, privileges, duration or conditions of employment."  Yerdon v. Henry, 91 F.3d 370, 378 (2d Cir. 1996).  Billingslea first alleges she suffered an adverse employment action when she was continuously given "extra work" to do, while Murphy and a small group of male employees were permitted to sit around.  (Billingslea Aff. ¶¶ 25-26.)  She concedes this "extra work" was within her job classification and it is clear the assignment did not violate the CBA.[7]

A plaintiff's assigned task, however undesirable it may be, does not constitute an adverse employment action under Title VII if it falls within his or her job responsibilities.  Dotson v. City of Syracuse, No. 5:04-CV-1388, 2009 WL 2176127, at *10  (N.D.N.Y. July 21, 2009); see, e.g., Martin v. MTA Bridges & Tunnels, 610 F.Supp.2d 238, 254 (S.D.N.Y. 2009) (finding that "[n]o reasonable employee would think being asked to perform tasks that are part of her job description constituted a materially adverse employment action"); see also Katz v. Beth Israel Med. Ctr., 2001 WL 11064, at *14 (S.D.N.Y. 2001) (finding that

---

[7]It is undisputed that under the CBA, supervisors are permitted to give daily work assignments as long as they fall within the employee's classification.  (Defendant's Statement, ¶ 4.)  Since Saldana was her supervisor and she admitted the work she was asked to perform was not outside her classification, it was not in contradiction with the CBA.  (Id. ¶ 5.)

"receiving unfavorable schedules or work assignments... do not rise to the level of adverse employment actions").  So, to the extent that Billingslea's disparate treatment claim is based on her assertion that receiving work within her job classification was an adverse employment action, her discrimination claim fails.

Next, Billingslea contends she viewed the temporary job change resulting from the suspension of her safety permit as a demotion because she had fewer responsibilities in the ATMPL position and lost overtime opportunities.  (Pl.'s Aff. ¶ 45.)  Ford contends that the suspension of Billingslea's safety permit did not work a materially adverse change in the terms or conditions of her employment because she did not suffer termination, discipline, loss of hourly pay, or loss of benefits.  (Def.'s Memo., pp. 13-14.)

An adverse job action is one that is "materially adverse," meaning more disruptive than a mere inconvenience or alteration of job responsibilities.  Galabaya v. New York City Bd. of Educ., 202 F.3d 636 (2nd Cir. 2000).  A transfer to a new position with different and less prestigious job responsibilities indicates a materially adverse change.  See de la Cruz v. N.Y. City Human Res. Admin. Dep't of Social Serv., 82 F.3d 16, 20 (2nd Cir. 1996) (holding plaintiff's transfer to a unit with little opportunity for professional growth and was less prestigious altered the terms and conditions of his employment in a negative way).

Billingslea does not specify how the ATMPL position is less prestigious than the PMHEH position.  However, Ford does not dispute her assertion, and it reasonably can be inferred Billingslea bid on the PMHEH position from the ATMPL position because it carries more prestige.

And while Billingslea's hourly rate increased slightly when she moved to the ATMPL position, she asserts that she lost overtime hours, thus reducing her overall pay.  (Pl.'s Aff.

¶ 45.)  See Little v. National Broadcasting Co., Inc., 210 F.Supp.2d 330, 397 (S.D.N.Y. 2002) (noting plaintiff could be subject to an adverse employment action where he produced evidence he incurred an actual loss in income because of lost overtime even though he remained at the same pay level); see also Faggiano v. Eastman Kodak Co., 378 F.Supp.2d 292, 306 (W.D.N.Y. 2005) (finding plaintiff suffered an adverse employment action where he lost opportunities for earning overtime benefits and his title and job duties were altered.).  Ford does not dispute that Billingslea lost overtime opportunities as a result of her transfer.  Accordingly, Billingslea has made the minimal required showing of an adverse employment action with respect to her change in title.

### (2) Inference of Discrimination

To complete her *prima facie* case, Billingslea must now show that the circumstances of the alleged adverse employment action gives rise to an inference of discrimination. Evidence showing that the plaintiff was treated "less favorably than other similarly situated employees outside [the] protected group" is one method of raising an inference of discrimination.  Mandell v. County of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003).  When employing this method, the other employees to whom a plaintiff compares herself must be "similarly situated" in all material respects and must have engaged in comparable conduct for which they were treated differently.  Shumway v. United Parcel Service, Inc., 118 F.3d 60, 64 (2d Cir. 1997) (citing Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992).

Here, Billingslea has not identified any PMHEH worker outside of her protected groups, who reported to Saldana, was involved in a similar serious personal injury violation, and was treated more favorably than Billingslea with regard to permit suspensions.

14

<u>Shumway</u>, 118 F.3d at 64. In contrast, Ford's records from 2001 to 2007 show that over 90 safety permits were suspended for 90 days or more for various reasons, including personal injury accidents. (Def.'s Stmt., ¶ 22; Def.'s Ex. G.) In some cases, permits were permanently revoked. (Def.'s Ex. G.) Although Ford's records are redacted, it is clear from the text that both men and women had their licenses suspended or revoked. (Id.) Because Billingslea states she was the "only black female handler in the area," it also is clear these suspensions were not imposed on African Americans only. (Id.) As Billingslea has not provided any basis upon which a factfinder could conclude that the circumstances of her suspension give rise to an inference of discrimination, she fails to demonstrate a *prima facie* case.

### b.    Defendant's Legitimate, Non-Discriminatory Reason

Even assuming Billingslea had succeeded in demonstrating a *prima facie* case with regard to her suspension, Ford has offered a legitimate, non-discriminatory reason for its action. Ford asserts Billingslea's license was suspended pursuant to well-established company policy. <u>Adams v. Debevoise & Plimpton</u>, No. 03-CV-3015, 2004 WL 1737826, at *1 (S.D.N.Y. Aug. 3, 2004). Ford relies on its policy governing safe operation of industrial vehicles, evidenced by an inter office letter, dated October 10, 1988, which explains the company standards for the "issuance of a safety permit to operators of... tow grips," and circumstances under which they will be suspended or revoked. (Def.'s Ex. I.) Ford explicitly stated that safety permits were being implemented to "prevent accidents and personal injury." (Id.) Ford also points to its application of this same policy on more than 90 occasions over a six-year period. (Def.'s Stmt., ¶ 22; Def.'s Ex. G.)

Moreover, Ford has offered evidence that Billingslea's suspension was imposed only after a thorough investigation in which both Billingslea and Saldana were found to have been at fault. (Duke Aff. ¶¶28, 32.) Duke testified that the only circumstance in which the minimum 90-day suspension would not have applied to Billingslea was if Saldana had taken full responsibility for the incident. (Id. ¶ 19.) Billingslea received the minimum 90-day safety permit suspension and no discipline, while her Caucasian male supervisor received a disciplinary letter that was to remain on file for one year. (Id. ¶¶ 38, 39.)

Where a defendant's actions are in accordance with its stated policy, which is not itself alleged to be discriminatory, the defendant has shown a legitimate, non-discriminatory reason for the adverse action. See Adams v. Debevoise & Plimpton, No. 03-CV-3015, 2004 WL 1737826, at *5 (S.D.N.Y. Aug. 3, 2004) (finding, "given [defendant's] policy of allowing termination after even one instance of insubordination, [defendant] has put forth a legitimate, non-discriminatory basis for terminating [plaintiff]"); see Garo v. Federal Exp. Corp., No. 07-CV-3794, 2010 WL 552339, at *10 (E.D.N.Y. Feb. 12, 2010) (finding that defendant's policy of terminating employees who received three warning letters demonstrates a legitimate, non-discriminatory reason for plaintiff's termination).

Based on the above, this Court finds Ford has articulated a legitimate, non-discriminatory reason for Billingslea's temporary permit suspension. Consequently, even assuming Billingslea had demonstrated a *prima facie* case, the presumption of discrimination "drops out of the picture." Hicks, 509 U.S. at 511.

### c.    Pretext for Intentional Discrimination

The burden would then return to Billingslea to demonstrate that Ford's non-

discriminatory reason is mere pretext for actual unlawful discrimination. "Pretext may be proven directly by showing that discrimination was a motivating factor in the decision," or indirectly by showing the defendant's proffered reason is false. Ruth v. Infonet Services Corp., No. 94-CV- 5576, 1997 WL 189038, at *4 (S.D.N.Y. April 17, 1997) (with citations).

Billingslea suggests that because Duke used the plural "circumstances" in discussing when a mandatory suspension might not be imposed, there must be additional mitigating "circumstances" that he did not disclose in his deposition. Billingslea, who had a full opportunity to depose witnesses and conduct discovery, offers nothing in support of this speculation.

Next, Billingslea urges that, because Saldana faked his injury, it is clear he intended that her license be suspended or that she be disciplined. However, Billingslea offers nothing in support of this theory. Even assuming Saldana acted out of spite, "personal animosity is not the equivalent of discrimination and is not proscribed by Title VII." Neratko v. Frank, 31 F.Supp.2d 270, 284 (W.D.N.Y. 1998) (quoting McCollum v. Bloger, 794 F.2d 602, 609-10 (11th Cir. 1986).

Billingslea has not offered any facts to support the conclusion that Saldana's actions or Ford's suspension of her safety permit were motivated by race and/or gender discrimination. See Kolesinkow v. Hudson Valley Hosp. Center, 622 F.Supp.2d 98, 112 (S.D.N.Y. 2009) (finding, "in the absence of evidence that Defendants acted in bad faith. . . or treated other employees differently... complaints about the adequacy of [Defendant's] investigation, even if accepted as true, cannot show pretext or defeat a summary judgment motion).

For all of the reasons stated above, Ford's motion for summary judgment will be

granted on the disparate treatment claim.

**C.    Plaintiff's Retaliation Claims under Title VII**

Title VII makes it unlawful for employers to retaliate against employees who participate in protected activities, such as challenging discriminatory practices or actions. 42 U.S.C. § 2000e-3(a); Sanders v. N.Y. City Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004). When evaluating a Title VII retaliation claim, courts employ the McDonnell-Douglas burden-shifting analysis. Richardson v. N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 443 (2nd Cir. 1999).

To establish a *prima facie* case of retaliation, the plaintiff must show that (1) she participated in a protected activity, (2) her participation was known to the defendant, (3) she suffered an adverse employment action, and (4) a causal connection exists between the protected activity and the adverse employment action. Richardson, 180 F.3d at 443; Jones v. Smithkline Beecham Corp., 309 F.Supp.2d 33, 356 (N.D.N.Y. 2004).

Ford argues Billingslea can not satisfy the first element because she did not engage in a protected activity. A protected activity is that which opposes unlawful employment practices under Title VII. See 42 U.S.C. § 2000e-3(a). In order for Billingslea's complaint to be considered a "protected activity" it must relate to race or gender. Taylor v. Family Residences & Essential Enters., Inc., No. 03-6122, 2008 WL 268801, at * 13 (E.D.N.Y. 2008 Jan. 30, 2008) (citing Gourdine v. Cabrini Med. Ctr., 307 F.Supp.2d 587 (S.D.N.Y. 2004) (noting that "otherwise, any employee who is disgruntled or dissatisfied with any aspect of his or her employment would ultimately find relief in Title VII even when race or gender were not at issue)).

Ford contends Billingslea did not make a complaint regarding any alleged racial or gender-based discrimination by Saldana prior to the suspension of her safety permit. (Def.'s Stmt., ¶ 54-57.) Billingslea admits the first such complaint was made to Labor Relations four days after she was notified of her license suspension. (Id. ¶ 58.) Billingslea's prior complaints were in regard to the extra work assigned to her and never mentioned race or gender discrimination. (Id. ¶ 55.) Because Billingslea concedes she did not engage in protected activity prior to her license suspension, she cannot set out a *prima facie* case as a matter of law, and her retaliation claim must fail. There is no need to continue the burden-shifting analysis. Defendant's motion on this claim is granted as well.

## D.      State Law Claims

Billingslea's claims under the NYHRL and Title VII are identical. "New York courts require the same standard of proof for claims brought under the [NY]HRL as those brought under Title VII." Tomka v. Seiler Corp., 66 F.3d 1295, 1304 n.4 (2d Cir. 1995). Accordingly, this court will not address the NYHRL claims separately. Based on the analysis above granting Defendant's Motion for Summary Judgment under Title VII, Defendant's motion is also granted under the NYHRL.


## IV.  CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted.

## V. ORDERS

IT HEREBY IS ORDERED, that Defendant's Motion for Summary Judgment (Docket No. 24) is granted consistent with this Decision and Order.

FURTHER, that the Clerk of the Court is directed to take the steps necessary to close this case.


SO ORDERED.

Dated:   November 30, 2010
            Buffalo, New York

                                                    _____/s/William M. Skretny_____
                                                        WILLIAM M. SKRETNY
                                                            Chief Judge
                                                    United States District Court